IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BURT HILL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 09-1285 |
| | ) | |
| v. | ) | Magistrate Judge Bissoon |
| | ) | |
| HAYDAR HASSAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

For the reasons that follow, Plaintiff's Motion (*see* Doc. 50) to prohibit Defendants' use of alleged "anonymous source" documents will be granted, Plaintiff's Motion (*see id.*) to disqualify Defense counsel will be denied, and Defendants' Motion to Compel (Doc. 62) will be denied, consistent with the instructions herein.

As referenced in an Order dated January 13, 2010 (Doc. 67), the current Motions relate to two sets of Plaintiff's documents, received by Defendants from purportedly "anonymous" sources in September and October, 2009. *See id.* at 1 (referring to documents as "the September Documents" and "the October Documents," respectively). The September Documents have been reviewed by Defense counsel and filed with the Court under seal (*see* Doc. 60); the October Documents, which have not been reviewed by Defense counsel, are being held by an Escrow Agent pursuant to the Court's January 13th Order. *See id.* at 2-3.

There is no record evidence regarding how Defendants came into possession of the September and October Documents. Rather, the Court is left with the unsworn statements of Defense counsel in their legal briefs.

As to the September Documents, Defense counsel states that "Defendants obtained these documents from an anonymous source," "in an un-labeled large manila envelope" left outside Defendants' rented office space in Dubai, UAE.  *See* Defs.' Opp'n Br. (Doc. 64) at 2-4; Defs.' Br. (Doc. 63) at 5.  The documents allegedly were retrieved by the sister-in-law of one of the Defendants, unspecified, who "was collecting [Defendants'] mail at their former leased office space and forwarding the mail to the [unspecified Defendant] at his new residence in Amman, Jordan."  *See* Defs.' Br. at 5 & n.1; *see also generally id.* (prior to September, 2009, all Defendants fled Dubai "due to concerns over their safety").

The details regarding the October Documents are even sketchier.  Defense counsel states that "[t]he second package of anonymous source documents [was] delivered [in October, 2009,] in another large envelope left at the personal residence of Defendant . . . Haydar Hassan in Amman, Jordan."  *See* Defs.' Mot. (Doc. 66) at ¶ 7.  While the parties are in agreement that the materials most likely came from one of Plaintiff's current or former employees,[1] there are no indications regarding:  whether the October Documents were hand-delivered to Defendant Hassan's personal residence in Jordan, or mailed; if the documents were mailed, whether the envelope contained shipping information that may be utilized to determine the identity of the source or to otherwise track the mailing; if the documents were hand-delivered, how or why the "anonymous" source presumably traveled over 1200 miles from Dubai, U.A.E. to Amman, Jordan to make the delivery; and, in any event, how the alleged anonymous source was aware of Defendant Hassan's personal address.  *Cf.* Order dated Dec. 4, 2009 (Doc. 40) at 7 (noting Defendants' attempted invocation of Fifth Amendment privilege against self-incrimination

---

[1] *See, e.g.*, Pl.'s Br. (Doc. 50) at 2 ("Defendants could have only obtained the [documents] through unauthorized access to Burt Hill's computers or conspiring with an existing . . . employee"); Ex. A to Defs.' Doc. 64 (unnamed Defendant received September Documents "from an apparently unknown source within [Burt Hill]").

in response to interrogatory seeking "all addresses at which [Defendants] have resided . . . since May 14, 2009").

At least with respect to the October Documents, Defendants' claimed lack of knowledge regarding, or involvement with, the purported "anonymous source" delivery appears highly suspicious. The Court also finds telling Defense counsel's failure to provide more specific information, let alone evidence in the form of sworn affidavits, regarding Defendants' receipt of the September and October Documents.

Defense counsel's heretofore unsubstantiated statements regarding "anonymous source" documents, and Plaintiff's questioning thereof, practically beg for the commencement of evidentiary proceedings. *Compare* discussion *supra with, e.g.*, Maldonado v. New Jersey, 225 F.R.D. 120, 125-27 (D. N.J. 2004) (discussing facts presented at hearing regarding plaintiff's discovery of confidential letter drafted by defendant, that "[somehow] allegedly ended up in [plaintiff's] workplace mailbox"). Indeed, were the Court to be convinced that Defendants conspired with others to obtain the September and/or October Documents, Defendants could well be the subject of severe sanctions for perpetrating a fraud on the court. *See, e.g.*, Perna v. Elec. Data Sys., Corp., 916 F. Supp. 388, 392-403 (D. N.J. 1995) (dismissing plaintiff's claims upon finding that he surreptitiously obtained confidential documents from defense counsel's briefcase and provided copies to his counsel).

Plaintiff has not requested a hearing, however, and holding one would seem contrary to Plaintiff's goal of expeditiously adjudicating its pending Motion for a Preliminary Injunction. Defendants also would seem less than eager to participate, given their prior objections to appearing in Pennsylvania for depositions. *See generally* Defs.' Doc. 27 at 6 (requiring

Defendants to travel to Pittsburgh would "result in a significant, lengthy, and costly disruption to their business, not to mention the expenditure of tens of thousands of dollars in travel costs").[2]

These things being said, the Court believes that there are sufficient grounds before the Court to adjudicate Plaintiff's Motion without resort to a hearing. Specifically, the record evidence concerning Defense counsel's handling of the September Documents warrants the entry of sanctions.

Upon receiving the September Documents from their client(s), Defense counsel retained Craig Simpson ("Mr. Simpson"), a Pittsburgh attorney claiming expertise in the areas of legal ethics and professional responsibility. *See* Defs.' Opp'n Br. at 4. In an opinion letter dated September 21, 2009 (the same date this lawsuit was filed), Mr. Simpson stated:

> The packet of information [that the unspecified Defendant] received [in September, 2009] consists of various internal emails of [Plaintiff], which the client believes is very beneficial to him and the other [Defendants]. Your question to me [is] whether there [is] any ethical prohibition against using the information which was surreptitiously provided to him by the unknown source . . . .
>
> Additional pertinent facts are[:] (1) your client did absolutely nothing to solicit the materials in question[;][3] (2) the materials

---

[2] Should any party disagree with this conclusion, the Court stands ready to fulfill that adjudicative function. *Cf., e.g.*, <u>Avramides v. First Nat'l Bank of Maryland</u>, 1996 WL 603977, *1 (S.D.N.Y. Oct. 21, 1996) (ordering evidentiary hearing to "resolve disputed questions of material fact" regarding alleged fraud on court).

[3] Although Plaintiff's Motion will not be analyzed under Federal Rule of Civil Procedure 11, the undersigned cannot help but question the sufficiency of Defense counsel's representations to Mr. Simpson, and, far more importantly, to the Court, regarding how Defendants came into possession of the September and October Documents. *See* Fed. R. Civ. P. 11(b)(3) (by signing documents filed before court, attorney "certifies that to the best of [his or her] knowledge, information, and belief, <u>formed after an inquiry reasonable under the circumstances</u>," "the factual contentions have evidentiary support or, <u>if specifically so identified</u>, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery") (emphasis added). Given that their clients, and their clients alone, possess knowledge regarding receipt of the September and October Documents, Defense counsel's reliance on the premise that "it is so because Defendants say it" is unwarranted. Even assuming Defense counsel has made a more exacting inquiry, any such efforts are unapparent from the record.

> provided to your client occurred prior to any litigation being instituted[;], (3) the materials provided to your client were so provided prior to [Plaintiff] being represented by counsel in the dispute, due to the fact that ligation had not yet been instituted[;] and (4) all pre-litigation negotiations to resolve any disputes were occurring directly between your current clients . . . and [Plaintiff].
>
> [T]his matter does not fall within Rule of Professional Conduct 4.2, dealing with 'Communication with Person Represented by Counsel.' Moreover, I have carefully reviewed Rules of Professional Conduct 4.3 (entitled 'Dealing with Unrepresented Persons') and 4.4 (entitled 'Respect for Rights of Third Persons')[.] None of the provisions of Rules 4.3 and 4.4 deal with your situation, and it is my opinion that any attempt to apply any of those provisions to your situation would be a stretch, to say the least. I should also add that[,] while Rules 4.3 and 4.4 would seem to be the proper Rules to review[,] I have also reviewed the remaining Rules of Professional Conduct, and I simply cannot find anything that would prohibit your use of the information in question.

*See* Ex. A to Doc. 64.

As previously determined by the Court, at least some of the September Documents are, on their face, covered by Plaintiff's attorney-client privilege. *See* January 13th Order at 2. It is unclear whether Mr. Simpson, as of the drafting of his September 21st opinion letter, had been advised of this fact. *See* discussion *supra* (stating only that "the client believes [that the September Documents are] very beneficial to him and the other [Defendants]"). In a second opinion letter dated January 7, 2010, however, Mr. Simpson ratified his opinions, notwithstanding clear references to attorney-client privilege. *See* Ex. A to Doc. 66.

In one respect, Mr. Simpson is correct: an appropriate starting point for the Court's analyses is the Pennsylvania Rules of Professional Conduct. *See* W.D. Pa. L.R. 83.3(A)(2) (adopting same). Pennsylvania Rule 4.4(b) states: "[a] lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the

document was inadvertently sent shall promptly notify the sender." *Id.* Of course, the "production" in question here was not "inadvertent," but rather intentional and unauthorized. As the explanatory comment to Rule 4.4(b) confirms: "[T]his Rule does not address the legal duties of a lawyer who receives a document that the lawyer knows or reasonably should know may have been wrongfully obtained by the sending person." *Id.* at cmt. 2.

Given the conclusory nature of Mr. Simpson's opinion letters, the Court may only speculate that he read the aforementioned provisions and concluded that no ethical concerns were implicated. The comment to Rule 4.4(b), however, begs the question whether attorneys and/or judicial officers must, under the circumstances, throw up their hands and conclude that nothing can or should be done to protect or ameliorate the document owner's privilege and confidentiality interests. Of course, the law does not support this conclusion.

Pennsylvania Rule 4.4(b) is identical to the American Bar Association's ("ABA's") Model Rule of Professional Conduct 4.4(b). State and federal courts in this District routinely have invoked the ABA Model Rules, from which the Pennsylvania Rules are derived, in interpreting the ethical responsibilities of attorneys. *See, e.g.*, Davisair, Inc. v. Butler Air, Inc., 1998 WL 1112611, 40 Pa. D. & C.4th 403, 408 (Pa. Comm. Pl. Nov. 18, 1998) (Wettick, J.) (recognizing same and relying on ABA Model Rule); Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 589 (3d Cir. 1999) (applying ABA Model Rules on case appealed from this District); *see also* Carbis Walker, LLP v. Hill, Barth & King, LLC, 930 A.2d 573, 577 n.2 (Pa. Super. 2007) (citing with approval ABA's "Formal Opinions" regarding Model Rule 4.4(b)).

In its explanatory comment, the ABA puts into perspective the law regarding intentional but unauthorized disclosures: "Rule 4.4(b) addresses a lawyer's receipt of documents sent inadvertently; it does not address the receipt of documents sent intentionally but from an

6

unauthorized source. . . .  Such situations are governed by the applicable substantive law and law of litigation procedure." *Id.* at cmt. entitled, "When Release is Unauthorized As Opposed to Inadvertent" (emphasis added).  Lest there remain any doubt, the ABA Opinion referenced in Carbis Walker, cited above, confirms that, although "[the a]pplication of other law is beyond the scope of the Rules, . . . the Rules do not exhaust the moral and ethical considerations that should inform a lawyer['s conduct]."  ABA Formal Ethics Opinion 06-440 (May 13, 2006) (emphasis added).

      Turning to substantive law, there exists ample authority recognizing that, in reviewing Plaintiff's privileged and confidential documents, Defense counsel proceeded at their and their clients' peril.  Even within the context of inadvertent productions, Pennsylvania courts have recognized that "an attorney receiving confidential documents has ethical obligations that may surpass the limitations implicated by the attorney-client privilege and that apply regardless of whether the documents in question retain their privileged status."  *See* Herman Goldner Co., Inc. v. Cimco Lewis Indus., 2002 WL 1880733, *1 (Pa. Comm. Pl. Jul. 19, 2002).  It is these principles that underlie the oft-cited protocol directing counsel, upon discovering the confidential nature of documents, to cease review, notify the owner, and abide by the owner's instructions regarding the documents' disposition. *See id.* at *1.

      To be sure, the law regarding inadvertent disclosures has not remained static. *Compare* discussion immediately *supra with, e.g.,* Pa. Rule 4.4(b) (requiring only that recipient of inadvertently produced documents "promptly notify the sender").  The justifications underlying the protections afforded to inadvertent productions, however, apply with even greater,

7

and stricter, force in connection with advertent but unauthorized disclosures. *See* discussions *infra* in text.[4]

The cases addressing unauthorized disclosures are decidedly unfavorable to Defendants. In Maldonado, for example, the court held that the "cease, notify, and return protocol" applied to the defendant's confidential letter, which "allegedly ended up" in the plaintiff's workplace mailbox. *See id.*, 225 F.R.D. at 125-27, 138.[5] The Maldonado Court, invoking its "inherent powers" to sanction ethically questionable conduct, held that plaintiff counsel's "possession, review, and use of the letter" warranted his disqualification from the case. *See id.* at 132-33, 141-42.

Other courts have sanctioned attorneys for materially similar conduct. *See, e.g.*, S.E.C. v. Brady, 238 F.R.D. 429, 445 (N.D. Tex. 2006) ("[f]ederal courts have authority to remedy litigation practices that threaten judicial integrity and the adversary processes," and "[s]uch inherent authority includes the ability to exclude 'proprietary' documents obtained . . . outside the context of formal discovery") (citation to quoted source omitted); Knitting Fever, Inc. v. Coats Holding Ltd., 2005 WL 3050299, *1, 4 (E.D.N.Y. Nov. 14, 2005) (where plaintiffs

---

[4] Although rules and decisions regarding inadvertent disclosures present an appropriate starting point, the analogy, by definition, eventually loses its vitality. *See generally* American Eagle Outfitters, Inc. v. Lyle & Scott Ltd., 2007 WL 2823337, *2 (W.D. Pa. Sept. 26, 2007) (applying five-part test used by Pennsylvania courts to address inadvertent disclosures). "[T]he reasonableness of the precautions taken," "the number of inadvertent disclosures," and "the extent of the disclosure" are less salient here, because Defendants did not obtain the September and October Documents through a "document production" by Plaintiff. *See id.* Likewise inapposite are the "measures taken to rectify the disclosure" and whether Plaintiff should be "reliev[ed] of its errors," because there is no evidence that the "anonymous source(s)" had authorization to provide Defendants the documents. The Court would note, moreover, that Defense counsel did not even satisfy the relatively lenient standard in Pennsylvania Rule 4.4(b), requiring "prompt notice," as Defense counsel only notified Plaintiff of their possession of the September Documents months after they were received.

[5] Because "[t]he ethical standards imposed upon attorneys in federal court are a matter of federal law," *see* Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1316 (3d Cir. 1993) (citation omitted), the Court will not restrict its discussions to Pennsylvania decisions.

obtained documents from "an undisclosed . . . employee" of defendants, plaintiffs' counsel had "a clear ethical responsibility to notify [defense] counsel and either follow the latter's instructions with respect to the disposition of the documents or [to] refrain from using them pending ruling by the [c]ourt"); Arnold v. Cargill Inc., 2004 WL 2203410, *7-10 (D. Minn. Sept. 24, 2004) (disqualifying plaintiffs' counsel for using "privileged and/or confidential" documents, obtained from defendant's former employee); Lahr v. Fulbright & Jaworski, L.L.P., 1996 WL 34393321, *2-4 (N.D. Tex. Jul. 10, 1996) (affirming magistrate judge's grant of protective order regarding former employee of defendant's unauthorized transmission of "proprietary" documents); *see also, e.g.*, Giardina v. Ruth U. Fertel, Inc., 2001 WL 1628597, *1-3 (E.D. La. Dec. 17, 2001) (holding same where plaintiff "refuse[d] to reveal how he obtained" defendant's letter); In re Shell Oil Refinery, 143 F.R.D. 105, 107-109 (E.D. La. 1992) (same where plaintiffs' counsel obtained documents from defendant's unidentified employee). Any suggestion that Defense counsel's receipt and retention of the September Documents carried no ethical concerns would come not from a careful study of the applicable law, but rather from a failure to appreciate it.[6]

---

[6] Given the conclusory nature of Defendants' expert opinions, the Court has no way of knowing why Defense counsel was assured that their retention and use of the "anonymous source" documents were ethically permissible. Although it is unclear whether Mr. Simpson was aware that the September Documents contained attorney-client privileged communications, he later ratified his opinion despite his knowledge regarding the same. *See* discussions *supra*. Even in the absence of privilege, courts have extended the "unauthorized disclosure" rules to materials that are "proprietary" or "confidential." *See, e.g.*, Knitting Fever, 2005 WL 3050299, *3 ("although it may be that some of the documents on their face have nothing whatsoever to do with attorney communications, . . . they do appear to be otherwise confidential") (citations and internal quotations omitted); Brady, 238 F.R.D. at 445 (extending rule to "'proprietary' documents obtained unfairly and outside the context of formal discovery") (citations omitted); Weeks v. Samsung Heavy Indus., Ltd., 1996 WL 288511, *3 (N.D. Ill. May 30, 1996) (applying rule to "otherwise confidential" documents). Finally, and Mr. Simpson's belief to the contrary notwithstanding, Defense counsel's receipt of the September Documents in advance of this litigation provides no basis for distinction. The fact remains that Defense counsel surreptitiously

The aforementioned legal authority aside, the Court believes, and therefore concludes, that Defendants' offering of purported "anonymous source" documents would raise "red flags" for any reasonable attorney under the circumstances presented.[7]  Defense counsel cannot legitimately disagree, having promptly retained an ethics expert regarding the matter.  Their expert's response, however, brings to mind the adage, "if something appears too good to be true, it probably is."

For all of the reasons stated above, the Court concludes that an invocation of its inherent sanctioning power is warranted.  The next question is what type of sanctions are appropriate.[8]

---

retained Plaintiff's September Documents for months after this lawsuit was filed.  *See* Arnold, 2004 WL 2203410 at *10 n.7 (rejecting argument that "no ethical violation was committed" because plaintiffs were "engaged in pre-suit investigation"; court's decision "[was] not premised solely on [counsel's] failure to return the documents" pre-litigation, but also was "based on the retention of the documents" after suit was filed); *cf. also* Lahr, 1996 WL 34393321 at *3 ("the court's inherent authority is intended to preserve the integrity of the proceedings before it," and "[t]his power is not to be constricted by formalistic [timing] distinctions like the one [plaintiff] attempts to draw").

[7] While not dispositive, it also is observed that several of the September Documents come with specific warnings of their confidential and/or privileged nature, as well as instructions and a protocol for notice of any disclosure to an unintended recipient and a protocol for the document's destruction.

[8] In Maldonado, the court applied a six-factor test to determine whether dismissal of the plaintiff's claims was warranted:  (1) the existence of extraordinary circumstances; (2) the presence of willfulness, bad faith, or fault by the offending party; (3) the consideration of lesser sanctions to rectify the wrong and to deter similar conduct in the future; (4) the relationship or nexus between the misconduct drawing the sanction and the matters in controversy in the case; (5) prejudice and the public interest; and, (6) the degree of the wrongdoer's culpability.  *Id.*, 225 F.R.D. at 133 (citation omitted).  Given that the conduct in question here was that of Defendants and their counsel, rather than Plaintiff, "dismissal" (or a grant of judgment on liability) has not been requested by Plaintiff.  Certain of the Maldonado factors, moreover, would require the Court to conduct an evidentiary hearing, as referenced above. *Compare* discussion *supra* in text *with* Maldonado at 133 (considering, among other things, the "presence of willfulness, bad faith, or fault by the offending party" and "the degree of the wrongdoer's culpability").  In any event, the Court remains convinced that it now possesses adequate grounds for the invocation of appropriate sanctions.

10

First, the Court rejects Plaintiff's request that Defense counsel be disqualified from this case. "When considering a motion to disqualify, a court must strike a balance between several competing considerations, including the unfettered practice of law, the judiciary's responsibility to ensure that the integrity of the profession is maintained, and striking a balance [between] the plaintiff's right to retain counsel of his or her choice against the opposing party's right to prepare and try a case without prejudice." Nesselrotte v. Allegheny Energy, Inc., 2008 WL 2890832, *4 (W.D. Pa. Jul. 23, 2008) (citation to quoted source omitted). "Motions to disqualify are generally disfavored, and a party's choice of counsel is entitled to substantial deference." *Id.*; *see also* Holcombe v. Quest Diagnostics, Inc., -- F. Supp.2d --, 2009 WL 4673858, *5 (E.D. Pa. Dec. 8, 2009) (disqualification "is a drastic measure [that] courts should hesitate to impose except when absolutely necessary") (citation to quoted source omitted).

Here, Defense counsel operated under a cloak of ethical propriety, having retained an expert who opined that the retention and review of Plaintiff's privileged and confidential documents was permissible. However questionable the expert's reasoning, the Court finds that Defense counsel's reliance on his opinions mitigates against disqualification. *See* Nesselrotte at *6 (denying disqualification based, in part, on counsel's "decision to retain an [ethics] expert in support of his position"; "a distinction exists, albeit a fine one, between the [c]ourt's disagreement with and rejection of [p]laintiff's counsel's arguments and a finding of bad faith"). The Court also is persuaded by Defense counsel's responsible handling of the October Documents, once it became apparent that their conduct would be subject to scrutiny. *See generally* January 13th Order (granting Defendants' Motion for judicial guidance, filed before Defense counsel accepted or reviewed October Documents); *cf. also* Defs.' Br.

(Doc. 66) at ¶ 14 (aptly observing that, "[t]hose who cannot learn from history are doomed to repeat it").

Finally, and as a purely practical matter, the Court would be hard pressed to agree that requiring Defendants to retain new counsel would advance Plaintiff's desire to adjudicate its Motion for a Preliminary Injunction at some point in the foreseeable future. *Cf.* Nesselrotte at *7 (distinguishing order of disqualification in Maldonado because "the discovery process [in that case] had just begun"). Although this case is in its relatively early stages, the sheer amount of time, effort and energy invested thus far has been staggering. *See generally* Dkt. (in three months since case was filed, parties have filed no fewer than sixteen motions and fifteen briefs, and court has entered twenty-three orders and held six conferences). Under the circumstances, granting Plaintiff's request to disqualify Defense counsel would substantially prejudice Defendants, not to mention undermine Plaintiff's stated goal of timely reaching the merits of its claims.

The Court, therefore, believes that a lesser sanction is appropriate, but that such a sanction must be sufficient to maintain the integrity of the judicial process and discourage future litigants and counsel from engaging in similar conduct. In this case, the appropriate sanction is to prohibit Defendants and their lawyers from in any way benefiting from their retention and review of Plaintiff's privileged and confidential materials. *See, e.g.*, Fayemi v. Hambrecht & Quist, Inc., 174 F.R.D. 319, 326 (S.D.N.Y. 1997) (despite fact that defendants' materials "would certainly have been subject to disclosure during the normal course of discovery," court entered sanction precluding plaintiff's use of information during litigation; this sanction "would prevent the plaintiff from benefitting from his wrongdoing and [was] sufficient to ameliorate any prejudice to the defendants"); Lahr, 1996 WL 34393321 at *3-4 (upholding

exclusion of "deceptively obtained evidence," where "the utilization of [the materials] for any purpose in this case would reward malfeasant conduct," "encourage the use of . . . subversive tactics," "unfairly disadvantage the defendant" and otherwise threaten administration of justice) (citation to quoted source omitted); In re Shell, 143 F.R.D. 105, 108-109 (holding same); see also, e.g., Giardina, 2001 WL 1628597 at *3-4 (finding plaintiff's receipt of defendant's letter "inappropriate and contrary to fair play," and prohibiting use of letter or any information contained therein).

Now is the point where the Court's analyses intersect with Defendants' Motion to Compel. Defense counsel explain their course of conduct, and the nature of their discovery objections, as follows:

> Although Mr. Simpson was of the opinion that the [September D]ocuments could be used at any time in the litigation to support pleadings and in depositions, once formal litigation ensued, defense counsel thought it better to provide [Plaintiff] the opportunity to produce the highly relevant anonymous source documents and other similar documents through discovery, before using them as exhibits in the case.

Defs.' Br. at 6.

To this end, Defense counsel propounded on Plaintiff a document request seeking "all communications that relate to [Plaintiff's] Dubai office, Haydar Hassan, Charles Fox, David Sinz, Tomas Gulisek, John Kim, or Ibrahim Altahan during the time period of July 1, 2008 through the present." See Pl.'s Opp'n Br. (Doc. 68) at 3 (quoting Defendants' Request for Production of Docs. No. 5, dated Dec. 3, 2009, hereinafter "RFPD 5").[9]

---

[9] Plaintiff asserts, and Defendants do not contest, that the scope of the parties' discovery disputes are encompassed through a discussion of RFPD 5. Compare Pl.'s Opp'n Br. at 9 n.14 with Defs.' Reply Br. (Doc. 71).

13

In response, Plaintiff objected repeatedly to the overbreadth of Defendants' discovery request. *See, e.g.*, Defs.' Br. at 8. As Plaintiff's counsel explains:

> The universe of documents encompassed by [RFPD 5] is limitless, especially in light of both the fact that . . . Defendants were the principals in charge of Burt Hill's Dubai office [from before July 1, 2008] until May 14, 2009 and the [broad] definition of '[r]elating to' in Defendants' [r]equest.

*Id.* at 3. Indeed, "[t]o provide a sense of the breadth of documents potentially responsive to [RFPD 5, Plaintiff's] Dubai servers alone contain in excess of two (2) terabytes of information from July 1, 2008 to the present. That amounts to approximately 1,000,000 files -- literally, thousands of bankers boxes full of documents." *Id.*

Plaintiff nevertheless attempted to comply with Defendants' discovery request, producing over 14,000 documents, *see id.* at 4, subject to the "parties express[] agree[ment to make] a rolling production." *See* Defs.' Reply at 2.

The remainder of the parties' disagreements regarding what they did, or did not do, to resolve their discovery disputes eludes meaningful adjudication. It suffices to say that the Court is in full agreement with Plaintiff that RFPD 5, as drafted, was and remains substantially overbroad. Although Defense counsel posits that "a simple electronic search of [Plaintiff's] databases" for terms likely contained in the "anonymous source" documents would have identified them, *see id.*, the fact remains that RFPD 5 called for a far broader production than the September Documents targeted by Defendants.[10] In any event, the Court finds no basis for

---

[10] Although Defendants characterize Plaintiff's production of over 14,000 responsive documents as a "document dump," *see* Defs.' Br. at 8 n.3, this is exactly what their overbroad discovery request contemplates. Any subsequent attempts to refine Defendants' request, *see* Defs.' Counsel's Dec. 22, 2009 Ltr. (quoted in Doc. 63 at 7), fall outside the scope of the Court's purview, and this is precisely why the undersigned encourages parties to seek judicial intervention regarding such matters. *See* Practices and Procedures at III(B)(3).

concluding that Plaintiff deliberately withheld production of the September Documents to the extent they were discoverable.

The Court also agrees with Plaintiff that Defense counsel's retention and review of confidential materials is a matter separate and apart from Plaintiff's allegedly deficient discovery responses.  This is not a case where Defendants and/or their counsel obtained documents, outside the scope of discovery, after Plaintiff improperly refused to produce relevant, non-privileged documents in response to a pending discovery request.  *Cf. generally* ABA Formal Ethics Opinion 94-382 (Jul. 5, 1994) (hypothesizing regarding same).  Rather, Defendants and their counsel took possession of and reviewed the September Documents before this case even was filed.

Simply put, Defendants and their counsel were discontent with waiting until the carefully constructed rules and procedures governing the discovery of relevant, non-privileged materials had run their course.  Once Defendants' substantially overbroad discovery request failed to result in the immediate identification and production of the September Documents, Defense counsel rushed to point the finger at Plaintiff.  Even entertaining the notion that Plaintiff's purported discovery failures should be considered in connection with Defendants' dubious ethical conduct, the Court views the latter as far more problematical and disconcerting than the former.[11]

---

While Defendants argue that Plaintiff should have sought judicial intervention before filing a Motion regarding the "anonymous source" documents, Plaintiff's grievances extended beyond that of a routine discovery matter, and had Defense counsel honored their ethical responsibilities, the parties' current disputes almost certainly would have come to light sooner.

[11] Although Defendants object regarding Plaintiff's specific assertions of attorney-client and work product privilege regarding the September Documents, *see* Doc. 63 at 11-15, there is nothing surprising, or untoward, in Plaintiff's resisting the production of the "anonymous source" documents improperly reviewed by Defendants and their counsel.  As held above, Defense counsel's ethical obligations extended not only to privileged documents, but to documents that were proprietary and/or confidential.  The Court's review of the September Documents has confirmed that they meet this description.  *See* contents of Doc. 60

In conclusion, the undersigned is deeply troubled by the direction in which Defendants and their counsel have taken this litigation. "[M]embers of the bar [and] the public" should not be required to endure "the nagging suspicion that [parties'] trial preparation and presentation of their case ha[ve] benefitted from confidential information obtained" outside proper channels. Richards v. Jain, 168 F. Supp.2d 1195, 1209 (W.D. Wash. 2001) (citation to quoted source omitted). "The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." *Id.* (granting motion for disqualification under similar circumstances).

Although the undersigned has concluded, given the unique circumstances presented in this case, that disqualification is inappropriate, the Court cannot understate the importance of its duties to "preserv[e] the public trust," "the scrupulous administration of justice," and "the integrity of the bar." *See* Arnold, 2004 WL 2203410 at *14.

The Court also concludes that firm sanctions are necessary to discourage similar conduct in the future. There appears no way of preventing a litigant who has obtained his opponent's privileged and/or confidential materials from claiming that the materials were received through an "anonymous" source. Were the Court merely to require the return of clearly privileged documents, this would be to deny the recipient something he was never entitled to in the first place. Under the circumstances, restricting sanctions to the return of privileged documents would be to impose no meaningful sanction at all.

---

(filed under seal) (repeatedly asserting confidentiality of information contained therein, and providing detailed instructions to unintended/unauthorized recipients in event of their receipt).

16

For all of the reason stated above, the Court hereby ORDERS the following:

A. Defense counsel shall immediately return to Plaintiff all copies of the September Documents within their possession, and counsel shall ensure the destruction of any copies in their clients' possession, as well as those copies in the possession of any other persons to whom the Defendants or their counsel have provided the September Documents.

B. If Defendants or their counsel have provided copies of the September Documents to any individual(s) other than Plaintiff, Defense counsel shall promptly serve on Plaintiff written notice identifying all persons who have received copies of the September Documents, which documents were provided, and an explanation why those documents were provided.

C. Defendants shall provide to Plaintiff a written certification, executed under penalty of perjury, that they and their counsel have returned and/or destroyed all copies of the September Documents, and that neither they, their lawyers, nor anyone else that they are aware of (other than Plaintiff), has retained copies of the September Documents.

D. The September Documents may not be used by Defendants or their counsel, directly or indirectly, in any way during the course of this litigation, or otherwise.  Plaintiff owes no duty of production regarding the September Documents.

E. Should Plaintiff's counsel determine, or have a good faith reason to believe, that any evidence previously adduced by Defendants in this case was secured through use of the September Documents, and should Defendants attempt to present such evidence in this litigation in any way, Plaintiff may move to strike the evidence.

  F. The Escrow Agent shall, as soon as is practicable, return the October Documents to Plaintiff's counsel. The destruction, notice and certification requirements in Paragraphs (A), (B) and (C), above, shall apply with equal force to Defendants and their counsel regarding the October Documents.

  G. Defendants' certification, as discussed in Paragraphs (C) and (F), shall include a statement that Defendants have not received or reviewed any "anonymous source" documents other than the ones addressed in this Order.

  H. Should Defendants in the future receive "anonymous source" documents, they shall immediately, and without reviewing them, forward the materials to their counsel, who, in turn, shall transmit the materials, without reviewing them, to the Escrow Agent.[12]

  I. Upon receipt of any additional "anonymous source" documents, the Escrow Agent shall not provide copies of said documents to any party, but shall transmit a notice letter to the undersigned's Chambers, "cc'ing" lead counsel for the parties, and he shall then await further instruction from the Court.

  J. To the extent that responsive, non-privileged, and otherwise discoverable documents are contained in the October Documents set, they are subject to production through the normal course of discovery. Any of the October Documents that Plaintiff claims are not subject to production shall be identified through amendment of its privilege log. Should disagreements regarding Plaintiff's privilege log arise, they shall be adjudicated through the normal course of litigation, although, should Defense counsel attempt to impugn Plaintiff's

---

[12] Upon the fulfillment of his current responsibilities under this Order, the Escrow Agent shall bill to the parties those costs and fees incurred by that point, and those fees shall be split evenly, with 50% being paid by Plaintiff, and 50% by Defendants. Thereafter, the services of the Escrow Agent shall be retained, at the expense of Defendants, to address any additional "anonymous source" documents that may surface.

privilege log entries based on knowledge acquired through Defendants' prior review of the October Documents, Plaintiff may object. If the Court, sitting as fact-finder, determines that Defendants have relied on their review of the October Documents, Defendants' challenges to Plaintiff's privilege log will be summarily rejected and the Court may find Defendants in contempt of this Order.

  K. Regarding Plaintiff's remaining duties of production, Defendants' requests to conduct a forensic examination of Plaintiff's computer devices and systems and for the appointment of a special discovery master are DENIED.

  L. The parties shall promptly meet and confer to determine whether the scope of Defendants' RFPD 5 can be narrowed, and/or whether they can agree upon computer "search terms" Plaintiff shall use to identify potentially responsive documents. If the parties are unable to amicably resolve their disagreement(s), they shall contact the undersigned's Chambers to schedule a conference.

  Defendants and their counsel shall comply with the mandates in Paragraphs (A), (B), (C), and sentence two of Paragraph (F) as expeditiously as possible, and in no event later than **February 5, 2010**.[13]

  IT IS SO ORDERED.


January 29, 2010            s\Cathy Bissoon
                    Cathy Bissoon
                    United States Magistrate Judge

cc (via email):

All Counsel of Record

---

[13] If Defendants or their attorneys determine, based on the rulings in this Order, that Defense counsel cannot continue to adequately and/or appropriately represent Defendants in this case, the Court will entertain a motion for withdrawal of counsel's appearance.